2009-5057, Morberly v. Secretary of Health and Human Services. Mr. Conway, when you're ready. Good day, your honors. My name is Kevin Conway. I represent the petitioner repellent in this case, Molly Morberly. Molly Morberly is a 13-year-old girl. She comes from Nebraska. She suffers from untreatable seizures and profound brain damage. She alleges that she was injured by a wholesale DPT vaccine she received when she was four months old. She claims that the vaccine program entitles her to compensation for these injuries. The Vaccine Act, Section 13-1A says a petitioner is entitled to compensation if she can prove that a vaccine caused her injury by preponderance of evidence. In this court, in the Altham case, defined what preponderance of evidence is by a three-prong test. But before going into the test and whether Molly satisfied this test, the Altham court also said that the field is bereft of science as to how vaccines cause injury. All vaccine injuries are controversial. There's no direct scientific proof that any vaccine causes any permanent injury. There's no direct science. It's circumstantial evidence. And so the Federal Circuit encouraged the use of circumstantial evidence. But Counsel, you acknowledge that a different process has to apply to the table injuries versus the non-table injuries, correct? Yes, Judge. So with the table injuries, it's strict liability, presumption, the whole thing, you automatically get... The only time we ever see these cases are when they're disputing how much they should get. But there's no issue of causation there. The plaintiff has no burden of proving causation, right? Well, they do have to prove that it's a table injury, Your Honor. Something which the respondent will hotly contest. If they prove that they had a seizure or whatever, in this case seizures don't apply any longer. But if they had an event that is on the table, it's automatically established. In the beginning days of the program, Your Honor, that was what Congress intended. Congress intended that most cases would be on table, that there'd be simple cases, that there'd be a presumption, and that either you got the presumption or you didn't. However, that was back 20 years ago when the program began. And now virtually every case in the program is an off-table case. So it is different, Your Honor. However, as I say, the elephant in quotes said, I prescribed a test for how you address off-table injuries. And they also said that the field is bereft of evidence. They said that the circumstantial evidence is encouraged. And they said that in most cases, it should be found to favor the petitioner. Well, here it seems to me on this record you've got, with respect to causation, you've got three doctors, Torkelson, Pong, and Harrison, none of which, as I read what the record said, they all declined to find a causal link. And you've got an expert on your side, Dr. Kilbourn, who was discredited by the special master. So I'm having a hard time figuring out, given our standard of review, how we're going to get to the results you want us to get to. Your Honor, you sat on the Capitano panel. There is no direct science as to how vaccines cause injury. You can't prove it. No, I know. Well, let's assume we all agree with that. But what you're left with is this record. Your Honor, you may. What is it in this record with respect to the medical statements or with respect to the discrediting of your expert that leads you to a causal link required under all of them? I will address that, Your Honor. The doctors found that she was healthy, that she had seizures after the vaccine. They all listed the vaccine on their differential diagnosis. They identified no other cause, and they instructed that no further pertussis be given. That's in the medical record, Your Honor. They all instructed that no further pertussis be given? I'm not sure I saw that in the record. It's in the record, Your Honor. Well, actually, initially, she, Molly's mother, requested of the doctor after speaking to the health department that no other pertussis be given, correct? And that her doctor then followed the request of the doctor. That's correct, Your Honor. But the doctor said that was understandable, and they did order that no further pertussis be given. As far as the medical theory, Your Honor, actually this court addressed this very exact same medical theory in Andreu, a case that was decided in June of 2009. In Andreu, the medical theory was precisely the same as in this case, and it was conceded by the respondent's expert. I've spent a lot of time on Andreu in preparation for this, and I see some differences. In Andreu, the first installation of DPT was the one that resulted in seizures even more quickly than were present in this case. That's correct, Your Honor. Here in Molly's case, her first DPT shot she had no reaction to. That's correct, Your Honor. And so it was the second DPT shot she had a reaction to. And in Andreu, the government didn't argue against this NCIS report the way they seem to have done in your case. That's correct, Your Honor. We have a lot of government evidence piled on top about the NCIS report, and in order to fall within it, what you'd have to do, how severe and how long the seizures would be, and how quickly, within the one week, and it'd have to be 30 minutes or longer in duration, and none of that evidence was presented by the government in Andreu. Your Honor, first of all, there are differences between Andreu and Molly. They're not significant. Indeed, Molly had a seizure with her first seizure, which Andreu didn't. In Molly's case, the timing of the seizure was, you know, Molly had a seizure with her first what? With her first seizures. She had a temperature of 101. Oh, had a fever. It was a febrile as opposed to afebrile. That is correct. Okay, I'm sorry. But Your Honor, just to answer your other question, actually Judge Bryson, you know, in his Lampe decision, you know, talked about the NCES and how the particular petitioner had to fit the facts of the NCES for it to be applicable to that case. And so this special master, picking up on Lampe, spent an extraordinary amount of time trying to fit, say, you know, unless you fit the NCES, you can't recover. But today we argue that the NCES, as Andreu found just this year, it's just a particular piece of the puzzle. It's one piece of evidence. It's not the whole ballgame. And it stands for a general proposition that, you know, there's an increase in encephalopathies, brain damages, after a wholesale DPT vaccine. I guess one of the distinctions to me seems to be that in Andreu the government didn't argue against the NC, the IS or ES? NCES. NCES. I keep getting the acronym wrong. Sorry. And here they did. They opposed it and put forth evidence, and then that caused Judge Wolski to say, well, can you go and see if you can talk to the authors and find out what they meant by all this? No, it was not the government. It was the special master. The special master is the one that wanted us to go to England to talk to him. And, you know, we weren't able to do that. But it was not the respondent. So the second Allison test, beyond the medical theory, is a theory that's been accepted in hundreds of cases in the 20-year vaccine program. What do we do with the difference between Dr. DeRay who testified that he thought there was causation in Andreu and this case where we have no treating physician who found causation? But they didn't find something else that caused it, and they didn't say it's not caused by the vaccine. Yes. But they just don't know. But we have said, and I think the Alton case and the Grant case both have said quite explicitly, that the absence of some other cause and the temporal inquity of the immunization and the event are not enough themselves to lead to a conclusion of causation. I don't see what more this case has than those two elements. It has a plausible biologic theory that has been accepted by this court as recently as in June of this year. It has a theory. It has treating physicians who didn't make a diagnosis. They're incapable of making a diagnosis. You can't diagnose a vaccine injury. However, they've made an association, and two years later at Children's Hospital, this is two years after it began, Children's Hospital, a teaching hospital, said all they can say is it's a seizure disorder, maybe related to DPT. This is all they had. This is the vaccine program. This is not scientific certainty. This is preponderance of the evidence. This is where close calls go to petitioners. Well, the worst thing that can happen is that a petitioner who is not injured by a vaccine gets compensated, and that's acceptable if you can show a plausible medical theory, if you can show the proper timing, if you can show the lack of an alternate cause, and if you can show that the government has not met its burden of bringing something else to show, something other than the vaccine, something unrelated to the vaccine that caused the injury. Well, going forward then, I guess you would say that no matter what an individual special master could conclude, because in this case the special master concluded that the theory was biologically implausible. I think that's the language that the special masters use based on testimony. But I guess you would say that you can't accept that finding because you would say, I take it that Andreu establishes to the contrary, and that going forward then, I guess you would say that henceforth, as long as you have temporal association plus lack of an alternative cause, you have causation. Plus a plausible medical theory. That's what I'm saying. You seem to be saying that plausible medical theory has already been established as a matter of law, because as I say, the special master did not find plausible medical theory here. He found it to the contrary, right? Despite the fact that the respondent's expert in this case conceded that the pertussis is a neurotoxin. He conceded that Dr. Kinsman's theory as to how it affects and overstimulates the neurons in the brain and causes seizures is accepted science. He rejected a critical portion of it. The only thing he rejected was the blood-brain barrier portion, is how the endotoxin opens it up. But Andreu, the government conceded that that was plausible, how the blood-brain barrier opens up. The expert did. The expert, yes, Dr. Herskowitz. Which this expert did not concede. Did not, correct. Are you saying that the government, having once conceded biological plausibility, is simply stuck with it? No, you know what I'm saying? Knudsen says you don't have to prove the precise biological mechanism. We don't know how cigarettes cause lung cancer. It's statistics to prove it. It's a neurotoxin. It affects the brain. It causes brain damage. Everybody concedes that. The precise mechanism is important. I don't think that Andreu makes that forever the case. As you said in Lampe, every case is turned to its own individual facts. Different special masters may find different results. That's what you said, and that's correct. And had another special master had Molly's case, we would not be here today because she has shown a plausible medical theory, one that's been conceded by the government. She's shown an inappropriate temporal relationship. She's shown a logical sequence of cause and effect in the total absence of another cause. She's the classic case that Congress intended to compensate when they passed the vaccine program. You can't prove it scientifically. None of these docs can prove it scientifically. All they can say is, hey, there's nothing else. She was healthy. Hey, maybe it's the vaccine. We know they can't do this. She was four months old when she got the vaccine. She's 13 today. She's been in the vaccine program for almost 11 years. It took the special master 23 months to write a decision. Obviously, he struggled with it. It was a close case in his mind. It took Judge Walsky 43 months to write a decision. Obviously, he struggled with it. It's a close case in his mind. We don't think it's a close case. We think it's a strong case. For those, the special master should have found for Molly. Judge Walsky should have found for Judge Molly. And I'm asking you today, please. The evidence is clear. It's strong. You should find for it. It's stronger than an Andrea, a gentleman who was compensated just in June of this year. And I ask you to give Molly the same consideration. Thank you. Thank you, Mr. Conway. And we'll hear next from Mr. Johnson. Good afternoon. May it please the Court. My name is Vo Johnson. I represent the Secretary of Health and Human Services in this matter. Your Honors, we acknowledge that this is a sad case, as most vaccine cases are. But the fact that Molly Moberly suffers from an unfortunate seizure disorder and developmental delays does not, in and of itself, qualify appellant for compensation under the Vaccine Act. The Act makes it clear that Congress intended for appellant to prove, by a preponderance of the evidence, that Molly's condition was caused, in fact, by her DPT vaccine. OK. But let's assume. We're very familiar with this, the background. So let's go right to the chase. Let's assume that we are not going to have, in any of these off-table cases, anything more, typically, than the temporal association and lack of another obvious cause. And that's going to be true of a lot of these cases. The ones I've seen, it's frequently the case, right? Where do you go from there as to saying who wins and who loses? Because, obviously, Andreo tells us that some people win. Your Honor. What's the difference between the winners and the losers in that when you've got those two facts and not much more? Your Honor, I would disagree that all we have in this case is the timing and a lack of other causes. We had the evidence that was submitted by the petitioners through their expert, Dr. Kinsborn. Dr. Kinsborn provided testimony regarding the NCES, and he tried to. . . Let's leave the NCES out of it. Let's assume that the special master is quite correct in saying that Molly is not a case child. Then Dr. Kinsborn also submitted a proposed mechanism, which he attempted to persuade the special master was reliable. The special master simply wasn't persuaded that there was enough support for Dr. Kinsborn's mechanism that it provided a basis. Well, that's the point on which I don't really understand exactly what the government's position is. You do agree, I take it, that the DPT, the pertussis ingredient of DPT, can cause catastrophic brain injury. DPT, there is a table. . . No, no, there can be. You would agree that there are catastrophic brain injuries resulting from DPT that occur off table, right? That as long as the petitioner proves by preponderance of the evidence that that is the case, yes. Right, but there will be some such cases. And the question is, what is going to be present in one of those cases that isn't present, let's say, in this case? I can't speculate as to what might be present in other cases, but as to what's present in this case, it was the petitioner's burden to introduce reliable scientific evidence linking the vaccine to her seizure disorder. And she attempted to do that through the medical records, which the special master found did not support a causal link because none of the treating physicians reached the conclusion that the vaccine was a more likely than not cause of her seizure disorder. So that's really what it comes down to is the treating physician's testimony? Well, in the absence of evidence from the medical records, it's also the petitioner's opportunity to produce an expert opinion, which Appellant in this case attempted to do through Dr. Kinsborn. But again, either route, whichever way the petitioner goes, it's the special master's job to weigh the evidence to determine whether it's scientifically reliable, which the special master in this case did by applying the Daubert standard. And only upon determining that the petitioner has offered some scientifically reliable evidence to link the vaccine to her condition, may the special master then reach a finding that the petitioner met her burden of proving by a preponderance of the evidence. Did the government introduce all of the evidence of Mr. Kinsborn? Kinsborn, yes. The findings that he was incredible by other courts, did you all introduce that to the special master? Or was that a judicially noticed thing done by the special master? Your Honor, I'm not sure whether that was something that was argued by the government or that was simply something that the special master was noting in his decision that other special masters had found Dr. Kinsborn to not have a facility with the NCES, which is consistent with what the special master found in this case. But you don't know whether the government made that argument to the special master? I can't recall at this time whether that was made. So what's the difference between this case and Andreu? Because we have to decide how to make our precedent reconcilable. Absolutely, Your Honor. And there are two very important differences between this case and Andreu. In Andreu, the court found that the special master erred in not considering and giving appropriate weight to the opinions of the treating physicians. And in Andreu, there was unequivocal testimony from a neurologist that treated Enrique Andreu that the DPT vaccine was the cause of his seizure disorder. We have no such evidence in this case. In fact, Dr. Torkelson, who was Molly's first treating neurologist, specifically commented in his medical records that Molly's presentation would not fall within any of the recognized syndromes that may be related to pertussis. But that was very early, right? Wasn't that his – correct me if I'm wrong, but I think that was long before the series of seizures that were really serious started. Yes, Your Honor, I believe. At that point, he's probably right, right? But that doesn't say anything about what he would have said six months later. You're correct that Dr. Torkelson – that record is from, I believe, November of 1996. But Dr. Torkelson continued to see Molly for months and months, and his records continue to reflect that, in his opinion, the etiology was unclear, meaning that he had more than ample opportunity to conclude later in time that the DPT vaccine was the cause. But he never reiterated the notion that this is inconsistent with the pertussis pattern, right? You're correct. The explicit statement where he is addressing the vaccine is only in that one record. However, it would be reasonable to infer that he was aware of the parent's concern about the DPT, and he could have revisited that. Counsel, so imagine we have two cases, all right? We have one case where there's a doctor who testifies, and the doctor says, I'm aware of only two facts. That's it. I'm aware of only two facts. There's a temporal proximity of the seizure to the vaccination, and I can find no other cause for the seizure. Therefore, I conclude causation exists. And we have the next case where you have a doctor, different doctor, says, I'm aware of only two facts. Guess what? They're the exact same two facts, not a single minute's difference in the temporal connection, no difference at all, no other cause established. That doctor says, well, based on this, I can't rule it out, but I can't say for sure it's what caused it, because, you know, I'm a little nervous about jumping to causation. How do we treat legally those two cases differently? Because that's what you're asking for here. Well, and the court, the precedent of this court, is that the way this court treats that situation legally is that deference is granted to the special master, and finding based on his review of the entire record of the court. Hold on. Deference is granted to the special master? Well, the special master and Andre, you came out the other way. Our court reversed him. Special master and Andre, you said Dr. Duret was uncredible. That is correct, Your Honor. Okay, so if the answer was we give deference to the special master, that can't be the answer, because that's not what we did in Andreu. We didn't give deference to the special master's very precise fact-finding. The court in Andreu found that the special master applied the incorrect legal standard, that the special master, in effect, required the petitioner in that case to produce epidemiological evidence to support his expert's medical theory. And that is the second critical difference between this court and Andreu, is that the special master here... No, back up. You're avoiding my hypothetical, and I need an answer. Okay. You've got two situations. You've got the one where the doctor says, based on these two facts only, I conclude causation. You've got another one where the doctor says, based on the same two identical facts, I can't say it's not the cause, but I can't necessarily say it is the cause. What do we do? Is that really the distinction that is the difference that we hinge all of our precedent on? The Vaccine Act requires that a determination regarding compensation in a vaccine act case is to be made based on the record as a whole. So the first answer is that looking at any one record in isolation should not decide the case, that that record, that that statement, that opinion, needs to be placed in the context of all of the other evidence in the record. The second answer to that question is that the Daubert standard should apply, that the Supreme Court has said that courts that are evaluating scientific evidence should make sure that that evidence is reliable before it's given any weight. And so there should be an inquiry as to whether the doctor, whether there's some basis for finding that that statement that may be present in the case, that's not present in this case, but that's present in your hypothetical case, is reliable, that it's worthy of being given some weight. I still don't hear the answer to my question. Would you say, let me try rephrasing the question in a way. Would you say given Judge Moore's two hypothetical questions that the proper disposition of those two cases, if they came up exactly as she described them with no further elaboration, the proper disposition by this court would be to affirm in both cases? That if those two cases both came to this court denying compensation? No. Let's say one of them granted compensation. First, let's take it. One of them granted compensation which the treating physician said yes, and the other denied compensation. Then I'm going to ask next about if there was denial of compensation in the first case. But as to the first, affirm both? I would argue that under this court's precedent, that those are fact-intensive findings by the special master and they're entitled to deference. I guess the answer is yes. Yes. Now, in both cases, the special master says no. In each of those cases, no. Despite the differences in the two cases. Do we affirm both cases? Keeping in mind that one of them looks an awful lot like Andrea. Andrea, excuse me. Your Honor, if those were the only facts, then obviously Andrea was the law of the circuit, and so that would suggest that if the court was faced with the facts as they were in Andrea here. I'm sorry, could you repeat your question? Well, in other words, what we've got is the problem we're facing here is if we have identical cases in which the only difference between the two cases is that the treating physician in one case has said, I think that's the cause, and the treating physician in another case says, I can't make a judgment as to whether it's the cause or not. Do we grant compensation regardless of what the special master says in the first case and deny compensation regardless of what the special master says in the second case? If your answer is no, we don't grant compensation in the first case, then I wonder what you do with Andrea, which is that case as far as I can see. And the reason I may be having trouble answering your question is because those aren't the only differences between the two cases. Yeah, but what more was present in Andrea than Judge Moore's hypothetical presented you with? It was the fact that the court first reached the conclusion that the special master had committed legal error, that the special master had- Well, but the court went farther than simply saying there was a legal error. The court then directed judgment in favor of Andrea, which means not only was there a legal error committed, but there was a factual mistake in that the evidence was not only sufficient to get to the special master but compelled a conclusion of judgment in favor of Andrea, correct? That's correct. Right, so you can't really distinguish that case on the ground that, well, it was a legal error because the court actually said that evidence not only is sufficient, but it compels a conclusion. So going back to my question, which is really Judge Moore's question, what is the difference? Why aren't the facts that I just described the facts of Andrea and would judgment not be compelled in favor of the petitioner? In Andrea, the court found that there was unequivocal treating physician testimony. Right, that was the difference that Judge Moore pointed out. Right, and the court found that that was sufficient. We don't have that in this case. So this case all comes down to the treating physician? Not necessarily, Your Honor. It comes down to the fact that the special master considered the testimony of the treating physicians, as he was required to do under Capozzano, but he also looked at the other evidence that the petitioner offered to determine whether that evidence as a whole met the petitioner's burden under Althon, and he simply found that he wasn't persuaded by either the evidence in the medical records or the testimony provided by Dr. Kinsborn. I'm confused. What's the difference between Andrea in this case other than the treating physician? The treating physician is the difference between this and Andrea. That's the only difference? Other than some minor things about how long until the first, like I think one of them it took three days and one of them it took two days, that there are some minor factual differences, but none of which would compel a different result. The other difference that I did want to point out that was discussed earlier is the idea of whether the biological possibility of the medical theory was conceded, and this court in Dreyu, this court found that that was not a prong of Althon that was in dispute, based on some language that it interpreted as the government's expert in that case, conceding biological plausibility. But if you go back to the special master's decision in Dreyu, and this is a 2007 Westlaw 2706157 at STAR-20, what the special master noted is that Dr. Herskowitz, the government's expert, acknowledged that in a laboratory setting pertussis antigen can cause neurotoxicity, thus agreeing with Dr. Tworney's basic premise regarding biologic plausibility, but he also opined that there was no evidence of such an effect from the vaccine as routinely administered to people. So there's a difference between the fact that biological plausibility was not conceded in Dreyu. It wasn't really conceded in, biological plausibility was not conceded in this case. It wasn't really conceded in Dreyu either, but the court found that that was not an issue in dispute. Here, that is a prong that... Okay, back up. So biological plausibility was not conceded in either case, but it's a distinction that we should give credit to in this case? No, but it's a distinction in the sense that the court in Dreyu... You said the court in Dreyu made a mistake, and that mistake is the basis on which we should... Not made a mistake, but found that that was not a prong of often that was in dispute. That has never been a prong... But you're saying that was a mischaracterization of the evidence. That was... I'm saying that what Dr. Herskowitz testified in Dreyu was not inconsistent with the position that the government took. Right, and which, despite the court having concluded to the contrary. The court simply found that that was not a prong that was in dispute. I don't know that the court made a factual finding on that. Okay, all right. But the bottom line is that you're saying that's another basis for distinction between this case and Andrew, because Andrew, there was no dispute that there was a theory. At least that's what the court concluded. Absolutely. Whereas here, the court concluded that there was a dispute, and indeed the special master had discredited the evidence on the other side and credited... Absolutely. Just so I know, did the special master say there was no dispute over the biological plausibility in Andrew? Or was it this court that characterized there being no dispute? The special master's exact language was that Dr. Herskowitz agreed with Dr. Tornatore's, the petitioner's experts, basic premise regarding biologic plausibility. So there was obviously a basis for this court to conclude that the biologic plausibility prong often had been met. I was simply trying to make the distinction that it wasn't based on a concession by the government's expert in that case. It was based on language that was in the special master's decision that that conclusion was made. Oh, OK. I think that may be making a particularly fine distinction, but we have your argument on that. Very well. Thank you. Mr. Conway, you have a little over two and a half minutes. Go ahead, Your Honor. Just a couple of quick points, Your Honor. First of all, the special master rejected the theory of biologic plausibility in Wally's case because he said it had not been tested. It has been tested. It's been tested in animals. It's not tested in humans because it's unethical to do so. That was the reason he acted. But was that testimony, I know in Andrea, as I recall, there were several, six tests, six studies introduced that dealt with animals. Was that evidence always so put into the record in the current case? No, Your Honor. However, that being said, the response expert agreed with the fact that the test is a neurotoxin. It can cause brain damage. It was a... Is the only point of dispute whether it can cross the blood-brain barrier? That's the only part of dispute. He said that that's a... It's not proof. It's just... He agreed it's a neurotoxin. It can cause brain damage. Yes, he agreed with the theory that it over-excites the neurons in the brain and can cause seizures. And in Andrea, the government conceded, even the blood-brain barrier aspect of the theory. And again, I'd like to talk about medical records. What do we do with the blood-brain barrier part here, though? You don't need it. Knudsen says you don't need to show the precise mechanism. You know that it gets into the brain. It's a neurotoxin. You know it gets in. How it gets in doesn't matter. We don't need to prove that. Science doesn't know that. It's a theory. But it's a biologically plausible theory. You don't have to do anything with it. It's in the brain. That's why it's on the vaccine table. This isn't a table case, but it's on the table. But pertussis causing encephalopathy and encephalitis is on the vaccine table because it causes brain damage. It's known. Precise mechanisms aren't known. And, Judge, if I may address, you were on the panel in Capozzano, and that was our case as well. And in Capozzano, the doctors say the same thing. They don't say the arthritis was caused by the vaccine. They say joint pain two days after vaccine. Nothing else. There's all these references because they can't prove it. They just make an association, just like in this case. And in this case, the court also talked about interfering with the doctor-patient relationship, how the special master in Andrea probably should not have asked for the depositions of the doctors, but since the doctor put in a letter, that was appropriate. But we don't like to disturb treating physicians' relationships with our clients and their patients. To drag them into a court proceeding is going to irrevocably change that relationship. That is not something that is favored by the vaccine program, as this court said in Andrea. It's not something we do, and that should make no difference whatsoever in this case. I think that Molly's case is stronger than Rick Andrea. She had a seizure, and many cases have been compensated in the vaccine program for that fact alone because there was a seizure, a fever accompanying the seizure. And the timing was documented in the medical records. Unlike in Andrea where they had to have a fact hearing and some question about that, Molly's case is stronger than Rick Andrea's, and to turn her away would be wrong. Thank you. Thank you, Mr. Conway and Mr. Johnson. Thank you, counsel. The case is submitted.